IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v | ) | CR. NO. 3:06cr199-MEF |
| | ) | (WO) |
| ANTHONY SANFORD | ) | |

**RECOMMENDATION OF THE MAGISTRATE JUDGE**

**I. Introduction**

The defendant, Anthony Sanford ("Sanford"), is charged with the unlawful transport of a firearm, in violation of 18 U.S.C. § 922(g)(1). On November 15, 2008, Sanford filed a motion to suppress a Derringer pistol and other evidence seized without a warrant during the search of a house on 448 Halfway Road. (Doc. No. 15.) On February 24, 2009, Sanford filed an additional motion to suppress, in which he asserts that his statement to law enforcement officers was involuntary and that a waiver of his rights was not knowingly and intelligently made. The court held an evidentiary hearing on the motion on May 13, 2009. Based on the evidence presented to the court and argument of the parties, the court concludes that the motions to suppress are due to be denied.

**II. Facts**

**A. The Search of the Halfway Road House**

During the course of a drug investigation on July 28, 2006, a confidential informant purchased illegal narcotics from a residence at 253 Willie J. Harris Drive. (Suppression Hearing Transcript, R. 7, 18-21.) The confidential informant told Tuskegee Police Detective Daniel Motley that, on the day of the purchase, he went next door to a house at 251 Willie

J. Harris Drive, where he learned that Darlene Moore was locked in a room. (R. 24.) The confidential informant stated that he saw Sanford unlock the door, allow Ms. Moore to get some water, and then lock her into the room again. (*Id.*) Later that same day, Detective Motley obtained a warrant to search the residences at 251 and 253 Willie J. Harris Drive based on the confidential informant's information. At that time, Detective Motley also had a warrant to arrest Sanford for an unrelated felony offense. (R. 8, 40.)

Three days later on July 31, 2009, two Alabama Department of Public Safety SWAT teams comprised of ten to twelve members each, as well as six Tuskegee police officers, drove up in two vans and at least three police cars to the residences. (R. 26-27.) At 5:47 a.m., the SWAT teams and officers executed the search warrants. (R. 45.) The officers used a battering ram to break down the door of the residence at 251 Willie J. Harris Drive. (R. 34-35.) Sanford's mother, Jacquelyn Sanford, awakened to the sound of a loud boom. (R. 120.) As Ms. Sanford got out of bed, five or six officers walked into her room with guns drawn and forced her onto the floor, where an officer used plastic restraints to secure her arms behind her back. (R. 121-22.) When Ms. Sanford complained that the plastic restraints were hurting, the officer removed the restraints and secured her arms in front of her with another set of restraints. (R. 122.) Detective Motley escorted her to the front yard. (R. 33, 35.) At some point, an officer removed the plastic restraints.[1]

---

[1] During the hearing, Ms. Sanford testified that she remained in handcuffs for approximately two hours and forty minutes. She stated that the cuffs were removed after she gave written consent to search the Halfway Road properties. Detective Motley, however, testified that Ms. Sanford was not wearing handcuffs during the search of her residence. Detective Motley recalled that entry into Ms. Sanford's residence occurred at 5:47 a.m., that he allowed her to use his cell phone to call her sister prior to giving consent, and that she signed the consent forms at 6:08 a.m. and 6:11 a.m. The court does not find Ms. Sanford's testimony that

2

Detective Motley and two other officers stood outside and talked to Ms. Sanford. (R. 37-38.) Detective Motley explained that the law enforcement officers received information that Ms. Moore was being held against her will by Sanford and that they were searching for them. (R. 41.) The officers cautioned Ms. Sanford that she could be charged with harboring a fugitive. (R. 123.) When Detective Motley questioned Ms. Sanford about the whereabouts of Sanford, Ms. Sanford indicated that she did not know where he was at the present time, that he she saw him leave with Ms. Moore the previous day, and that there was a possibility that he was in another house or trailer down the street at 444 or 448 Halfway Road. (R. 8-9, 42, 57-58.) Ms. Sanford told Detective Motley that the property belonged to "her and her family."[2] (R. 5, 46-47.) Before signing consents to search the residences, Ms. Sanford called her sister on Detective Motley's cell phone and explained the situation. At 6:08 a.m. and 6:11 a.m., Ms. Sanford signed consent forms to search the house and trailer on Halfway Road. (R. 43, 45.) Afterward, Ms. Sanford told Detective Motley, "Don't hurt my baby." (R. 58.)

The law enforcement officers drove to the house and trailer on Halfway Road. (R. 9.) At 7:30 a.m., the officers announced their presence, entered the one-story house, and began searching the interior of the house and its attic. (R. 10.) The house had no furniture and was

---

she remained in plastic restraints while outside her home over a two hour and forty minute period to be credible. The court was able to observe the demeanor of both witnesses during the hearing, and finds that Detective Motley's recollection is more accurate and logical than that of Ms. Sanford's recollection of events.

[2] During the hearing, Ms. Sanford explained that her sister, mother, and grandmother own the property on Halfway Road.

empty. (R. 53.) The officers found a Model D38 Derringer pistol and six bullets in a tin can along the edge of the chimney/fireplace area and a bullet proof vest in the attic. Inside a closet, an officer found Ms. Moore. Her hands were bound with wire,[3] she was not wearing a shirt, she had two braids in her hair, and she was limping. (R. 10, 13.) She told the officers that Sanford had beaten her and that he was inside the house. (R. 11.) Although officers used tear gas and other law enforcement tactics, they could not find where Sanford was hiding. (R. 52.) Detective Motley began to doubt Ms. Moore's statement that Sanford was in the house. (*Id*.) Ms. Moore, however, insisted that Sanford was hiding inside the house. (*Id*.) At some point, an ambulance took Ms. Moore to the hospital. (R. 10.)

In their final efforts, the officers borrowed a chainsaw from a fireman on the scene. (R. 52.) When an officer started the chainsaw and began cutting the sheet rock, Sanford's head "popped up" into the attic. (R. 53.) The officers who were searching in the attic pulled Sanford out from an area between the sheet rock and the chimney wall where he had hidden himself during the search. (R. 55.) Sanford was arrested and transported to the Macon County Jail. (R. 11.)

### B. The Mental Limitations

A clinical psychologist, Dr. Robert D. Shaffer, testified concerning Sanford's mental conditions. The psychologist conducted examinations on November 18, 2008 and November 20, 2008. After conducting testing, Dr. Shaffer determined that Sanford's I.Q. was in the low

---

[3] Ms. Moore testified that Sanford kept her in the house against her will with a loaded pistol, but that her hands were not bound.

4

average range.  In addition, Dr. Shaffer diagnosed Sanford as suffering from post-traumatic stress disorder and major depressive disorder, recurrent.  The psychologist's determination was based in part on Sanford's reports of a traumatic childhood and a prior incident in which Sanford was the victim of police brutality.  Dr. Shaffer testified that Sanford's performance on the Suggestibility Scale resulted in a yield score approximately one standard deviation above the norm, indicating that Sanford had a greater than average tendency to agree with a questioner or admit to things that are not true.  (R. 91.)  Dr. Shaffer also assessed that, due to Sanford's tendency toward suggestibility, his mental conditions, and his recurring memory of a prior negative experience with a law enforcement officer, Sanford was afraid of being "severely injured or killed" if he did not answer correctly at the time he waived his *Miranda* rights and gave a statement to law enforcement officers.  (R. 95.)

During the suppression hearing, Dr. Shaffer indicated that he had not received a copy of Sanford's statement to police prior to making his determination.  (R. 109.)  After a recess in which the psychologist was given an opportunity to read the transcript in its entirety, Dr. Shaffer modified his previous findings and testified that he "[did] not sense [Sanford] was entirely suggestible" when providing a statement to the police and that Sanford was "acting in a self-serving manner" when he denied beating the victim.  (R. 113 , 117.)  Dr. Shaffer, however, did not alter his previous opinion that Sanford's past history and mental conditions prevented him from having the capability of appreciating his *Miranda* rights, specifically his right to counsel.  (R. 113-14.)

5

### III.  Discussion

### A.  The Halfway Road House Search

Sanford asserts that the warrantless search of the house on Halfway Road was unreasonable because his presence, custody, and control over the residence established that he had a reasonable expectation of privacy in the house, the officers did not knock and announce themselves before entering, and his mother's written consent to search the house was not voluntarily given.

The Fourth Amendment guarantees "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. AMEND. IV.[4]  The Amendment's primary purpose is to protect citizens from unwarranted governmental intrusion and to prevent abusive police power.  *See Johnson v. United States*, 333 U.S. 10, 13 (1948); *United States v. Mendenhall*, 446 U.S. 544, 553-54 (1980) (plurality opinion).  The Fourth Amendment draws a firm line at the threshold of a residence because "'[a]t the very core of the Fourth Amendment stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.'" *Payton v. New York*, 445 U.S. 573, 589-90 (1980) (quoting *Silverman v. United States*, 365 U.S. 505, 511 (1961)).  Unless consent is given or exigent circumstances exist, police officers must obtain a warrant supported by probable cause to justify a search under the Fourth

---

[4]The entire text of the Amendment provides:

[T]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

6

Amendment. *United States v. Magluta*, 418 F.3d 1166, 1182 (11th Cir.2005); *Payton*, *supra*. A search of property without a warrant and probable cause is constitutionally permissible if preceded by valid consent. *United States v. Dunkley*, 911 F.2d 522, 525 (11th Cir.1990).

First, the court must determine whether Ms. Sanford had the authority to consent to the search of the house on Halfway Road. "[W]hen the prosecution seeks to justify a warrantless search by proof of voluntary consent, it is not limited to proof that consent was given by the defendant, but may show that permission to search was obtained from a third party who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected." *United States v. Matlock,* 415 U.S. 164, 171 (1974). "The authority which justifies the third-party consent does not rest upon the law of property, with its attendant historical and legal refinements . . . , but rests rather on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched." *Matlock,* 415 U.S. at 171 n.7. *See also Georgia v. Randolph*, 547 U.S. 103, 111 (U.S. 2006) ("[T]he reasonableness of such a search is in significant part a function of commonly held understanding about the authority that co-inhabitants may exercise in ways that affect each other's interests."). During the hearing, Ms. Sanford testified that the house on Halfway Road belongs to her mother and grandmother and that her sister's "name is on all the papers." (Suppression Hearing Transcript, R. 126.) She also stated that "she don't have no right in [the house]." (*Id.*)  Ms. Sanford's testimony

7

indicates that she did not have "joint access or control [of the house] for most purposes." *Matlock*, *supra*. Therefore, Ms. Sanford did not have actual authority to consent to the search of the house.

Nonetheless, the search of the house is justified based on the searching officers' objectively reasonable, good faith belief that Ms. Sanford had authority to consent to the search of the house on Halfway Road. A warrantless entry is valid when it is based upon the consent of a third party whom the police, at the time of entry, reasonably believed possessed authority over the premises. *U.S. v. Mercer*, 541 F.3d 1070, 1074 (11th Cir. 2008) (citing *Illinois v. Rodriguez*, 497 U.S. 177 (1990)). As with other factual determinations bearing upon search and seizure, "determination of consent to enter must be judged against an objective standard: would the facts available to the officer at the moment . . . warrant a man of reasonable caution in the belief that the consenting party had authority over the premises?" *Id.* at 1074. *See also Terry v. Ohio,* 392 U.S. 1, 21-22 (1968). If the answer is no, "then warrantless entry without further inquiry is unlawful unless authority actually exists. But if so, the search is valid." *Rodriguez*, *supra*. In this case, Ms. Sanford told Detective Motley that the property belonged to "her and her family." (Suppression Hearing Transcript, R. 5.) The record also indicates that the house on Halfway Road is on property near Ms. Sanford's home. (R. 5.) In addition, Ms. Sanford indicated on the consent form that she was "the owner or person in charge of the item or premises to be searched." (Attach. to Doc. No. 21.) Thus, the officers' belief that Sanford's mother had the authority to consent to the search of family property on Halfway Road was objectively reasonable. *See e.g., United States v.*

8

*Mathis*, 96 F.3d 1577, 1584 (11th Cir. 1996) (officers had an objectively reasonable belief that defendant's mother had the authority to consent to search a detached garage next to her house); *Hughes v. Coconut Creek Police Dept.*, 233 Fed. Appx. 919 (11th Cir. 2007) (no Fourth Amendment violation where officer had an objectively reasonable good-faith belief that he had obtained valid consent from the defendant's father to search the bedroom).

Next, the court will discuss whether Ms. Sanford's consent was voluntary. A consensual search is constitutional if it is voluntary, *i.e.* the product of an essentially free and unconstrained choice. *United States v. Purcell*, 236 F.3d 1274, 1281 (11th Cir.2001); *United States v. Garcia,* 890 F.2d 355, 360 (11th Cir.1989) (citing *Culombe v. Connecticut,* 367 U.S. 568, 602 (1961)). Voluntariness is a factual assessment and depends on the totality of the circumstances. *Purcell*, *supra.* In evaluating voluntariness, the court considers several factors, including the presence of coercive police procedures, the extent of the individual's cooperation with the officer, the individual's awareness of his or her right to refuse consent, the individual's education and intelligence, and the individual's belief that no incriminating evidence will be found. *Id. See also U.S. v. Sanders*, No. 08-10198, 2009 WL 449181, at *2 (11th Cir. Feb. 24, 2009) (unpublished).

In this case, the Government submitted a consent to search form signed by Ms. Sanford, in which she acknowledged that she understood that she had the right to refuse the search of the property on Halfway Road, that she had the right to withdraw her consent, that she could consult with her attorney, and that she was under no obligation or pressure to allow the search. (Attach. to Doc. No. 21.) During the hearing, Ms. Sanford testified that officers

9

pointed a gun at her, rolled her out of the bed onto the floor, and handcuffed her. (R. 120-21.) She stated that, after the officers took her outside, they accused her of harboring a fugitive and asked her if she knew where Sanford was. (R. 123.) At the time she signed the consent form, there were at least three officers standing in front of Ms. Sanford and she heard others behind her. (R. 125.) Ms. Sanford testified that she believed her choices were "to cooperate or go to jail." (R. 125.) She also stated, "I think [the officers] told me if I didn't do what I need to do, because I'm harboring a fugitive, then I knew I had to do what I need to do to stop from going to jail." (R. 131.)

The detective's description of the events surrounding the signing of the consent form is somewhat different. Detective Motley acknowledged that 24 officers dressed in SWAT gear and carrying special guns arrived at Ms. Sanford's residence and a house next door to her property and secured the residences with their guns drawn. (R. 31.) Detective Motley testified that he and other officers awakened Ms. Sanford and escorted her to the front yard. (R. 35.) Detective Motley explained to Ms. Sanford why the officers were searching her residence. (R. 39.) Detective Motley testified that Ms. Sanford was no longer handcuffed during their discussion. (*Id.*) Detective Motley stated that he told Ms. Sanford that he was looking for Darlene Moore and was concerned about her safety and asked if she knew where Sanford and Ms. Moore were at that time. (R. 42.) Ms. Sanford initially stated that she did not know Sanford's location. (*Id.*) When Detective Motley asked where Sanford most likely would have gone, Ms. Sanford told him he could have gone to the house or trailer on Halfway Road. (*Id.*) Detective Motley also testified that he did not threaten Ms. Sanford and

10

that she did not appear to be afraid. (R. 56.)

Courts have found consent to be voluntary in factual scenarios more coercive than that described by Ms. Sanford. In *United States v. Espinosa-Orlando,* 704 F.2d 507, 513 (11th Cir.1983), for example, the court found consent voluntary where the consenting individual was arrested at gunpoint and consented to the search of his automobile while lying on the ground and while one officer had a weapon drawn. In *United States v. Hidalgo,* 7 F.3d 1566, 1571 (11th Cir.1993), consent was voluntary where the defendant was "arrested by SWAT team members who broke into his home in the early morning, woke him, and forced him to the ground at gunpoint." In *Garcia,* 890 F.2d 355, 362 (11th Cir. 1989), the consenting individual was arrested and handcuffed in the presence of fourteen law enforcement officers when consent was provided. In each of these cases, consent was found to be voluntary despite evidence of some physical coercion. The situation described by Ms. Sanford, in which she was awakened by officers in SWAT gear, temporarily placed in handcuffs, taken outside her home, and cautioned by a detective that she could be arrested for harboring a fugitive if she did not disclose her son's whereabouts, does not rise to the level necessary to invalidate her consent to search the house. This court therefore concludes that Ms. Sanford's consent to search the house on Halfway Road was voluntary.

Furthermore, the evidence does not demonstrate that Sanford had a reasonable expectation of privacy in the abandoned house. While the government bears the burden to demonstrate an exception to the warrant requirement where police conduct a warrantless search, the defendant first bears the burden to demonstrate that he had a legitimate

11

expectation of privacy in the area searched. *Florida v. Riley,* 488 U.S. 445, 455 (1989) (O'Connor, J., concurring); *Rakas v. Illinois*, 439 U.S. 128, 143, n.12 (1978) (defendant's burden to demonstrate reasonable expectation of privacy); *United States v. Baron-Mantilla*, 743 F.2d 868, 870 (11th Cir. 1984) ("defendant bears the burden of demonstrating a legitimate expectation of privacy in the areas to be searched.); *United States v. Chaves*, 169 F.3d 687, 690 (11th Cir. 1999) (a defendant must demonstrate that he personally has an expectation of privacy in the place to be searched, and that his expectation is reasonable). Although Ms. Sanford told Detective Motley that Sanford sometimes goes to the Halfway Road house when he is not at her residence, there is no admissible evidence indicating that he had permission to be there. Ms. Moore, who was found inside a closet and had spent considerable time with Sanford, testified that the house was abandoned. (R 65.) The house had no furniture and the only belongings found were a tin can filled with bullets, a pistol, and a bullet-proof vest. In his brief, Sanford argues he had an expectation of privacy in the house because the door to the house was locked when the officers arrived. Nothing in the record, however, indicates that Sanford locked the door or that he had a key to the Halfway Road house. Consequently, this court concludes that Sanford has not established that he had a reasonable expectation of privacy in the abandoned house. *See United States v. McCrae*, 156 F.3d 708, 711 (6th Cir. 1998) (no subjective expectation of privacy in vacant house where defendant did not own or rent house, was there for limited period, and condition of house did not indicate permanent occupation). *Cf. Minnesota v. Olson*, 495 U.S. 91 (1990) (overnight guest can assert reasonable expectation of privacy in home of host). Furthermore, even if this

court were to assume that Sanford had a sufficient privacy interest in the premises, the officers in this case were reasonable in believing that Ms. Sanford had provided valid consent to search the house on Halfway Road. Based on the foregoing, this court concludes that the defendant's motion to suppress the evidence seized during the search of the house on Halfway Road should be denied.

## B. The Statement

Sanford asserts that the waiver of his rights was involuntary because he suffers from mental deficiencies. Specifically, he contends that law enforcement officials took advantage of his low intelligence and mental condition when they asked him to sign a waiver and questioned him about the incident. Sanford also asserts that the waiver was not knowing and intelligent because he has a verbal I.Q. of 83, has only a tenth grade education, repeated three grade levels in school, and his demeanor and mannerisms clearly indicate that he would have difficulty comprehending the rights outlined in a waiver form.

In *Miranda v. Arizona*, the Court held that a person questioned by law enforcement officials after being "taken into custody or otherwise deprived of his freedom of action in any significant way" must first "be warned that he has the right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney." 384 U.S. 436, 444 (1966). Therefore, under *Miranda*, the admission of statements taken during a custodial interrogation conducted outside the presence of a suspect's attorney is conditioned on the Government's ability to show "that the defendant knowingly and intelligently waived his privilege against self-incrimination and his

13

right to retained or appointed counsel." 384 U.S. at 475. The inquiry has two distinct dimensions. First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. *Moran v. Burbine*, 475 U.S. 412, 421 (1986). "[C]oercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause." *Colorado v. Connelly*, 479 U.S. 157, 167 (1986). Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the "totality of the circumstances surrounding the interrogation" reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude that a defendant's *Miranda* rights have been waived. *Moran*, *supra*.

In this case, no evidence supports a conclusion that law enforcement officials coerced Sanford into giving a statement. Absent allegations of coercive police tactics to obtain a statement, a confession will not be deemed involuntary. *Connelly*, 479 U.S. at 167; *Singleton*, 847 F.2d at 671; *U.S. v. Scheigert*, 809 F.2d 1532, 1533 (11th Cir. 1987). Detective Motley and Agent Brown did not subject Sanford to an interrogation of "exhaustingly long duration."[5] *Miller v. Dugger*, 838 F.2d 1530, 1537 (11th Cir. 1988). In addition, Sanford does not allege that law enforcement officials applied physical force or threatened to do so. Nor is there any suggestion that law enforcement officers made any promises of reward to induce Sanford's statement.

---

[5] The interview lasted fifty-one minutes. (Doc. No. 39, pp. 2, 37.)

Sanford claims that due to his limited mental functioning and his tendency to become easily confused or manipulated, the officers "should have known that he did not understand the document or the ramification of executing the waiver." (Doc. No. 30, p. 4.) The mere fact that a defendant suffers from a mental disability does not render a waiver involuntary. *Connelly*, 479 U.S. at 169-70; *United States v. Barbour*, 70 F.3d 580, 585 (11th Cir. 1995). The low intelligence of a defendant also will not in itself render a confession involuntary. *See Connelly*, 479 U.S. at 167. Instead, in the absence of other evidence of coercion, it must be shown that the police took advantage of the defendant's mental limitations in securing a *Miranda* waiver. *Barbour*, 70 F.3d at 585; *United States v. Jennings*, 491 F. Supp. 2d 1072, 1076 (M.D. Ala. 2007).

There is no evidence that Detective Motley or Special Agent Dwight Brown knew that Sanford suffered from post-traumatic stress disorder, depression, or any other mental limitations. Moreover, the transcript of the police interview indicates that the officers took numerous precautions to ensure that Sanford's waiver of *Miranda* rights and his statement were voluntarily made. During the interview, Sanford acknowledged to Agent Brown that he understood his rights. On several occasions throughout the interview, Agent Brown reminded Sanford that he could stop the questioning at any time and that he did not have to answer the questions. (Doc. No. 39, Interview Transcript, pp. 7, 10, 15.) Sanford refused to answer two of Agent Brown's questions and neither Detective Motley nor Agent Brown dissuaded him from doing so. (*Id*., pp. 10, 12.) Indeed, Sanford's refusal to answer some of the questions during the interview indicates that he understood and was aware of the

15

consequences of waiving his right to silence. For example, at one point during the interview, Sanford refused to answer a question about a prior escape charge and said, "I don't want to mess myself up." (*Id*., p. 7.) Later during the interview, Sanford indicated that he would not answer a question about an incident with another woman and said, "That's a serious question right there. . . . That get me in trouble." (*Id*., pp. 10-11.) Sanford's refusal to answer some of Agent Brown's questions during the interview indicates that he understood and was fully aware of the consequences of waiving his right to silence.

Although Dr. Shaffer testified that Sanford told him he did not understand that he would not have to pay for an attorney, the court does not fully credit Dr. Shaffer's opinion. At the request of Sanford's defense counsel, Dr. Shaffer examined Sanford on two occasions over a one week period for the purpose of determining whether he was competent to waive his *Miranda* rights. Dr. Shaffer admitted that Sanford's police interview indicated that he was capable of acting in a self-serving manner. Given the gravity of the situation, it is likely that Sanford also acted in a self-serving manner during the psychological evaluation conducted by Dr. Shaffer. Moreover, Sanford's statements during the police interview indicate his understanding of the legal system is greater than what he represented to Dr. Shaffer. For example, during the police interview, Sanford asked whether the charges he faced were felonies and whether giving a statement would help or hurt his case. This court therefore concludes that Sanford's waiver of his *Miranda* rights was voluntary.[6]

---

[6] In light of Dr. Shaffer's modification of his previous findings upon reading the police interview transcript, this court rejects the defendant's argument that Sanford was susceptible to suggestibility during the police interview.

16

A finding based on the lack of evidence of coercion, however, does not complete the analysis. The waiver must also be knowing and intelligent. *Moran v. Burbine*, 475 U.S. 412, 412 (1986). Recent psychiatric evaluations and test scores indicate that Sanford's intelligence is in the low average range of intellectual functioning. As previously discussed, Sanford's refusal to answer some of the questions indicated that the waiver of his right to silence was made with an awareness of the consequences of doing so. In addition, the record indicates that Sanford has sufficient intelligence to understand the consequences of waiving his right to counsel and that his rights were read to him prior to giving a statement. This court therefore finds that Sanford's waiver of his constitutional rights was made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. *See Toste v. Lopes*, 861 F.2d 782 (2nd Cir. 1988) (holding that defendant who was "streetwise, communicated relatively well, and operated at about a sixth to seventh grade level," knowingly and intelligently waived his right to remain silent).

Upon consideration of the totality of the circumstances surrounding the interrogation, this court concludes that Sanford's choice was uncoerced and that he had the requisite level of comprehension to waive his rights and provide a statement to law enforcement officials. *See Moran*, *supra*.

### IV. Conclusion

Accordingly, it is the RECOMMENDATION of the Magistrate Judge that the defendant's motion to suppress be denied. It is further

ORDERED that the parties shall file any objections to the said Recommendation on or before **June 15, 2009.**  Any objections filed must specifically identify the findings in the Magistrate Judge's Recommendation to which the party objects.  Frivolous, conclusive or general objections will not be considered by the District Court.

Failure to file written objections to the proposed findings and recommendations in the Magistrate Judge's report shall bar the party from a de novo determination by the District Court of issues covered in the report and shall bar the party from attacking on appeal factual findings in the report accepted or adopted by the District Court except upon grounds of plain error or manifest injustice.  *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982).  *See Stein v. Reynolds Securities, Inc.*, 667 F.2d 33 (11th Cir. 1982).  *See also Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (*en banc*), adopting as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

Done this 2nd day of June, 2009.

                                       /s/Charles S. Coody
                                      CHARLES S. COODY
                                      UNITED STATES MAGISTRATE JUDGE